### EDWIN LUDLOW *v.* EDWARD HURD, ET AL.

1. The power of the Cincinnati and Marietta Railroad Company, under section 13 of the act of February 11, 1848, regulating railroad companies, to borrow money on the security of its property and income, includes the authority to mortgage *after-acquired property*, and embraces every species of property, owned by the company, necessary to the operation of the road.

2. *Office furniture*, suitable in kind and of a necessary amount, provided for the use of the employees of the company in the performance of their daily duties, as well as for the directors to transact their business, is covered by such a mortgage; and at the instance of the trustee, will be protected by injunction against the attempts of a judgment creditor, who has levied thereon, and threatens to sell it, when it appears that the other mortgaged property would be insufficient to pay in full the mortgage debt.

SPECIAL TERM.—On demurrer to the petition. Action to restrain proceedings under an execution and levy, made at the instance of Hurd as a judgment creditor, upon certain personal property belonging to the Cincinnati and Marietta Railroad Company.

The plaintiff claims that he is the mortgagee, in trust, for certain holders of bonds issued by the Cincinnati and Marietta Railroad Company. The conveyance is in due form, properly executed and recorded in the recorder's office of Hamilton county, dated March 1, 1857, to secure the payment of fifteen hundred bonds for one thousand dollars each, which are to become due on September 1, 1880, with seven per cent. interest, payable semi-annually. The property

described in this, " the third mortgage," deed, is "the road of said company and its branches, made or to be made in the State of Ohio, including the right of way and the land occupied thereby, together with the superstructure and the tracks thereon, and all the bridges, viaducts, culverts, fences, depot grounds, and buildings thereon, and all other appurtenances belonging thereto, and all franchises, rights and privileges of the company, in and to the same; also, all locomotives, tenders, cars, machinery, tools, implements, fixtures, wood, fuel, oil, waste, and other materials or property then owned, or *thereafter to be acquired and owned by said company*, for the purpose of using or repairing said road, or any other of the property of said company," with power on the part of the company to dispose of any of the property not necessary to be retained for its roadway, depot grounds, or stations, nor required for the construction or convenient use of the road.

That five hundred of the bonds described in this instrument of mortgage have been negotiated by the company, and are a subsisting charge upon the property mortgaged.

That the defendant, Hurd, having recovered a judgment for $274.33 against the company, before Nathan Marchant, a justice of the peace in and for the township of Cincinnati, in the county of Hamilton, has caused execution to be issued thereon; that said execution came to the hands of the defendant, James Cassidy, a constable in and for said township, and was, by said constable, on October 15, 1857, levied upon "the furniture contained in five several rooms of the company's business office in Cincinnati, situated on Third street," which is particularly described in the complainant's petition; also, the furniture contained in another business office of the company in Cincinnati, in one of the rooms of the Burnet House. It is alleged that the property is advertised for sale by the officer who levied the execution, and will be sold unless the court interfere; that the above offices "are attached, belong to, and form a part of the railroad and its appurtenances, and were established and fitted up

and furnished by the company for the purpose of transacting and carrying on the business on the said road, they being necessary therefor, and are yet used for that purpose ;" that the furniture levied on is indispensable to the full enjoyment of the use of the road, and is a part and parcel of the property conveyed to the plaintiff by said third mortgage deed of the company. It is further stated that the sale of the property, so levied on by said constable, as advertised by him, would produce great injury to the plaintiff and to the holders of said third mortgage bonds, by depriving the company of the use of the same, and thereby reducing and lessening the business and earnings of the company, and thus preventing the payment of the interest and principal of the bonds, which business and earnings are not now more than sufficient to pay said interest, and would also tend to render the mortgage security aforesaid, ineffectual and worthless. That the company has made default in payment of the interest on said bonds; that the company is wholly insolvent, and that if the property so levied on should be sold on said execution, the remaining property covered by said mortgage will be insufficient to pay in full the principal and interest due on said bonds. It is further stated that the property levied on was acquired by the company subsequent to the execution of the mortgage.

To this petition, the defendant, Hurd, has demurred.

*S. S. Cooke* and *Taft & Perry*, for plaintiff.

*E. W. Kittredge*, for defendants, Hurd and Cassidy.

Storer, J.   Two questions are presented upon the pleadings in this case—

First: The authority of the railroad company to borrow money, and to mortgage their property to secure it?

Second: What property passed by the conveyance to Ludlow?

Section 13 of the law of February 11, 1848, " regulating railroad companies," gives express power to  every such

corporation " to borrow money, not exceeding its authorized capital stock, at a rate of interest not exceeding seven per cent. per annum, and may execute bonds or promissory notes therefor, and, to secure the payment thereof, may pledge the property and income of such company."

This provision, so fully conferring a right to borrow money, to issue bonds, and secure their payment by a mortgage upon the property and income of the company, dispenses with the necessity of discussing the question of corporate power, upon general principles. However doubtful it may have been regarded by courts of high authority, we are saved the labor of examining conflicting opinions, as well as the effort to reconcile them.

We must hold the company was fully authorized to execute the mortgage referred to in the petition.

The second question involves the inquiry : " What property passed by the description in the deed?"

In ordinary cases, this is to be determined by the intention of the parties, as indicated by their contract; and where, after a general grant of the principal thing, its incidents or appurtenances are not expressly reserved or excluded, the transfer will be held to cover the subject specifically granted, and all that is connected with it, as naturally dependent upon it, or that may be properly regarded as essential to its full enjoyment.

This is the rule affirmed in Whistler's case, 10 Co. 64 and 65, which is followed in all the modern cases, as in 6 Greenleaf, 436, *Blake* v. *Clark;* 1 Sumner, 492, *United States* v. *Appleton;* 11 Conn. 525, *Parsons* v. *Camp;* 18 Wend. 157, *Van Wyck* v. *Wright,* and in 20 Ohio, 401, 412, *Morgan* v. *Mason,* where it is said : " Whatever is actually enjoyed with the thing granted as a beneficial privilege at the time of the grant, passes as parcel of it." Therefore, everything belonging to the estate conveyed, as an incident or appurtenance, passes by the grant, and to this end the law gives, in all cases, a reasonable intendment to the grant.

The principle thus established is of universal application in the transfer of real property ; and though its origin dates

back to a very remote period, when the alienation of land was guarded with great jealousy, and then necessarily confined to a class of estates to which but few, if any of the appurtenances of modern times were incident, its application is none the less just or equitable.

The improvements in mechanics have introduced new modes by which the business of the world is not only performed, in its various departments, but essentially controlled in its results. Hence, the adaptation of steam power to locomotion includes not only the enjoyment of rights of way, but the construction of road-beds, and the consequent use of the various materials necessary to their fabric; the ownership, also, of engines, with their various appendages, rail cars, baggage and freight cars, are alike indispensable. It is equally necessary to the full enjoyment of the franchise conferred upon a railroad company, that the corporation should hold depots and depot grounds, machine shops, and other establishments for the manufacturing, as well as the repair of their engines and cars. The same power must be given, either expressly or by necessary implication, to own or rent suitable buildings to accommodate their different employees in the transaction of their daily duties, as bookkeepers, clerks, and cashiers, as well as furnishing a proper place for the directors to hold their meetings.

It must follow from the power thus given, that the company may provide furniture proper for their different offices, and which may well be included in, and pass by the name of corporate property, and which, though practically separate from, and forming no immediate part of the railroad, its appurtenances, franchises, or machinery, are still so closely connected with the proper management of the road, and the interest of the stockholders, as well as the creditors, that they can not be dispensed with and the purposes of the railroad be accomplished.

A corporate body, whose daily business is the transportation of passengers and freight, in whose capital stock large amounts are invested by every class, should be held to the

strictest accuracy in their accounts. Their receipts and expenditures can only be known when this duty is fulfilled to the letter; hence, the power to employ the most competent clerks, and the duty to provide all the necessary accommodations, to enable them to have an intelligent and careful supervision of the various transactions of every day. On no other theory can frauds be prevented, or, if committed, detected.

It is very clear, then, we must regard as appurtenant to, and necessary for the proper working of, a railroad, that all the species of property to which we have referred, should become a part of the road itself, essential, indeed, to its use; and, if denied, destructive to the purpose for which it was built.

There may be, unless we look carefully at the relations the several departments of a railroad bear to each other, no clear apprehension of their real identity, when the rights of the corporation are questioned. We may separate the appurtenance from the subject when real estate is conveyed, and there yet be a thing to be enjoyed, while its measure or extent only is impaired or restricted; but, in a case like that before us, if one of the incidents essential to the successful operation of the road is withheld, the consequence may be irreparable injury to all concerned in the prosperity of the enterprise.

It was, without doubt, the intention of the company to pledge their whole available property, all they could legally call their own, of which they were then possessed, or might afterward lawfully acquire, for the security of the bondholders, on the terms stated in the deed of trust; and if they could not, as a corporate body, be the owners of any other property than that connected with, incident to, or necessarily attached to the proper operation of the road, it would seem to follow that every portion of it that they might lawfully possess they might lawfully pledge.

At common law, it is said an assignment will not convey title to chattels, except those "*in esse*," at the time of the

transfer. This doctrine had its origin, we are told, in the determination, on the part of the courts, at an early period, " to prevent maintenance and the multiplication of contentions and suits, so that no possibility, right, title, or any other thing not in possession, could be granted or assigned to strangers;" and so strictly was it applied that a grant of land, where the vendor was out of the possession, was void. Co. Lit. 265, a. n. 1; 3 Mees. & Wel. 197, *Mogg* v. *Baker;* 5 Maule & Sel. 238, *Robinson, et al.* v. *Macdonnell;* 7 Adol. & El. N. S. 850, *Gale* v. *Burnell.*

The English courts still adhere, as it will be seen in the cases already cited, with many qualifications to the ancient maxim, and have been followed by American judges, who, while they admit the power of precedent, and feel bound to follow what is believed to be established, nevertheless interpose very significant exceptions to its full application.

Thus, in 6 Man. & G. 247, *Tapfield* v. *Hillman, et al.,* Tindal, C. J., said: "It would have been very easy to have so framed the power of entry as to make it extend to all effects found upon the premises at the time that such power should be enforced;" and Coltman and Maule, Justices, clearly admit that, as between the parties, there may be a valid transfer of such property. In 10 Met. 481, *Jones* v. *Richardson,* and in 13 Met. 29, *Moody* v. *Wright,* it is said that "one can not grant or mortgage property of which he is not possessed, and to which he has no title at the time;" and this doctrine is affirmed in 2 Cush. 294, *Barnard* v. *Eaton,* and in 3 Cush. 306, *Codman* v. *Freeman;* so in 3 Gilm. 455, *Rhines* v. *Phelps, et al.;* 4 Coms. 581, *Griswold* v. *Sheldon.*

But in the latter case, as well as in 7 Shep. 408, *Abbot* v. *Goodwin,* it was admitted that a mortgage lien will cover chattels purchased after the deed is executed, with the proceeds of those actually mortgaged; and where there was a right to sell reserved to the mortgagor, it must have been the intention of the parties that the proceeds of all property sold should be subjected; and this is the principle upon

which also, 1 R. I. 511, *Jenckes' Adm'r* v. *Goffe*, and, 3 Sanf. 499, *Southworth* v. *Isham*, were decided.

How far, upon these adjudications, the rights of intermediate creditors, or mortgagees, are affected at law, is matter of grave consideration. We suppose the better rule to adopt is that which prevails where a mortgage is given to secure subsequent advances. In such cases, our own courts have decided that the security can not be extended to exclude the property from the levy, or seizure, of an intervening creditor; 15 Ohio, 253, 260, *Kramer* v. *F. M. Bank;* 17 Ohio, 371, *Spader* v. *Lawler;* 6 Conn. 37, *Shepard* v. *Shepard.*

We have remarked that, at law, the principle to which we have referred seems to be mainly applied. In equity, it is greatly mitigated, if not for many purposes denied.

Lord Eldon, *in re ship Warre,* 8 Price, 269, decided that the future earnings of a ship would pass, though the transfer of the vessel was made while she was at sea. "I take it to be clear," says he, "that if there be an assignment made of the earnings and freight of an existing voyage, it is valid; and if that be so of a voyage *in esse,* why not of one in immediate *posse ?*"

So, in 4 Myl. & C. 560, *Wellesley* v. *Wellesley,* Lord Cottenham held that "a covenant to secure an annuity, by a charge upon freehold estates, or by an investment in the funds, or by the best means in his power, will create a lien upon any property to which the covenanter becomes entitled, between the date of the covenant and the time for its performance;" and, again, in 6 Simons, 224, *Metcalfe* v. *The Archbishop of York,* the same chancellor said: "There can be no doubt that a covenant to charge, or dispose of, or affect lands hereafter to be acquired, operates, in equity, upon lands so afterward acquired, against the party creating the charge."

The question is very ably discussed in 1 Hare, 556, *Langton* v. *Horton,* and the same conclusion adopted. It was

there decided "that the mortgage of a ship, then on a whaling voyage, with all cargo which might be caught and brought home in the vesssel, was, as against the assignor, a valid assignment in equity, as well of the future cargo to be taken during the particular voyage, as of that, if any, which existed at the time of the assignment."

If we regard this equitable doctrine in the case before us, we may, very readily, conclude that, by its proper application, we shall subserve the purposes of justice, and carry out the intentions of the parties to the contract.

Where a railroad company is authorized, by law, to mortgage its whole corporate property, which includes not merely its road-bed, and the structures connected with it, but all its rights and franchises in addition, a conveyance, by such terms, must comprehend the power to reconstruct or repair the road, by all the means necessary to accomplish the purpose. Whatever is added to the original structure becomes a part of it, and can not be severed from it; and if the security by the mortgage is to continue to be of any value during the period that must transpire before the bonds become due, it must depend upon the implied covenant of the company to keep it in running order, and thus earn the necessary sums to discharge the accruing interest, and, eventually, indemnify the creditors for the principal debt.

By the transfer to the plaintiff, we must hold, then, that a paramount right to all additions, made to the railroad subsequent to the date of the deed, was vested; that the plaintiff could, at any time, when interest was unpaid, take possession of the subject, which will include every species of property then owned by the company, as attached to, or incident to the road itself. If the right to the possession exists, then the right to protect the property from sale, necessarily follows; and the plaintiff may ask us to aid him by injunction. The question, in such a case, is, "Who has the better right, in equity, to call for the legal estate, or the legal possession?" and if the equitable owner of the incumbrance has done enough to perfect his equitable title, he has the better right;

1 Hare, 560, 562, *Langton* v. *Horton;* 4 Myl. & C. 408, *Newlands* v. *Paynter.*

The Supreme Court of New Hampshire, in 32 N. H. 484 *Pierce* v. *Emery,* have decided the direct question before us, though the case is somewhat involved. In New Jersey, 3 Green Chy. 377, *Willink* v. *Morris Canal & Banking Co.,* it was held that a transfer of the canal property carried with it all subsequent additions to the subject.

In the late case of *Phillips, et al.* v. *Winston,* not yet reported, but, in the opinion, of which a copy has been furnished to us, the Court of Errors of Kentucky have adopted the same rule, and decreed a perpetual injunction against the intervening creditors, who had levied on property acquired by the company subsequent to their mortgage; and a similar construction is given by Judge McLean in the case of *Coe, trustee,* v. *Pennock, et al.,* decided at the July term of the circuit court for this district, reported in the American Law Register, for November, 1857, Vol. 6, p. 27.

We have been referred to a clause in the deed of trust which authorizes the mortgagors to dispose of any part of the property that may not be necessary to the use of the road; and, it is urged upon us, that this power, thus reserved, is inconsistent with the estate granted by the deed itself, and must, therefore, defeat it.

It may, in many cases, be a very suspicious circumstance, when such a permission is given by the mortgagee; as, for instance, where a stock of goods, or articles of ordinary consumption, are pledged absolutely, and the title is consequently vested in the mortgagee; the liberty reserved to the mortgagor to sell, might well furnish, if unexplained, an implication of fraud in the contract; but where, from the nature of the property pledged, it is indispensable that many portions of it should, from time to time, be repaired, reconstructed, or renewed, there can be no impropriety in permitting the party who is bound to keep up the road, and provide all things necessary to its use, to dispose of the old material, either in

36

part payment of new appliances, or for its general preservation.

By this permission no one can be defrauded, and no rule of law is violated. The recording of the mortgage advises the public that the company have pledged their property, and it seems to us that the license to sell it, as limited in the deed, confers no greater right than the mortgagors would have had if no such clause were inserted. A broken locomotive, a worn-out rail, the timber necessary to repair the road-bed, require to be protected from injury, and made available for the purposes of the pledge; hence, the mortgagor may well be the agent of the parties interested in the security to see that their property, however useless, is not totally lost, and a power to sell, if necessary to effect that object, might be inferred from the relation of the parties to each other.

The question how far the property and franchise of a railroad company, or any similar corporate body, may be subject to sale by execution, has been frequently discussed and determined, of late years, both in England and the United States. It is settled, we suppose definitely, that the franchise, which includes the right of toll, can not be levied on and sold, unless the legislature who granted it, assent to the transfer. This was decided in 5 Iredell, 297, *State* v. *Rives.*

It is the rule adopted by the Supreme Court of Pennsylvania in 13 Serg. & Rawle, 212, *Ammant* v. *The New Alexandria & Pittsburg Turnpike Road;* 5 Watts & Serg. 266, *Leedom* v. *Plymouth R. R. Co.;* and in 9 Ib. 27, *Susquehanna Canal Co.* v. *Bonham;* in Massachusetts, 4 Mass. 596, *Tippets* v. *Walker;* in Kentucky, 5 B. Monroe, 1, *Winchester & Lexington Turnpike Company* v. *Vimont..*

In Ohio, the point was fully examined and decided, in 10 Ohio, 476, *Seymour* v. *Milf. & Chilicothe Turnpike Company.*

The result is very clearly stated in the very accurate and learned treatise on the Law of Sheriffs and Coroners, by Mr. Gwynne, page 241: "The right of taking toll is a franchise, and is not, at common law, nor by the statute of Ohio, regu-

lating judgment and executions, subject to levy upon execution; it may be reached in chancery."

And the rule thus established is not confined to the franchise merely; it covers every case where it is attempted to separate the structure of a railway or turnpike road, in parts, by a seizure on execution. The whole work is regarded as an entire thing, and each portion so dependent upon every other that the integrity of the fabric, from its commencement to its terminus, will be preserved.

Thus it is said in 13 Serg. & Rawle, 212, already cited: "The inconvenience would be excessive if the right of the company could be cut up into an indefinite number of small parts, and vested in individuals." Such a course would defeat the object of the incorporation, both as respects the stockholders, and the public also, who have at least a very material interest in the preservation of every important thoroughfare, as they derive daily benefit from its use. We must regard, then, not among the least of the considerations which very properly press upon us, in examining a question like this, the public right and the public advantage. So long as a highway, similar to the present, can be kept up, it is required by the public interest that it should be. When, however, the corporate body becomes so involved in debt that it can not longer fulfill the object for which it was created, a court of equity should interfere, take possession of the whole property, and wind up the concern. This is not only the course indicated in kindred cases, but it is peculiarly fit where creditors and debtors, with their varied interests in a common fund, are to be protected by an equal division of the assets, according to the priority of their liens.

We have referred to this view of the case to illustrate, more fully, the rule we should adopt in examining the questions submitted by the pleadings.

We can not now determine whether the property levied on is essential to the business of the company, upon the principles we have laid down. It may be that there has been extravagant expenditures in the furnishing of the apartments occupied as

offices; it may be that economy has been ignored, and the fashion of the day, in the outlay of money, has been adopted; it may be that the old rule, " *Sic utere tuo ut alienum non laedas,*" has been forgotten; and it is our duty, if either the one or the other of these conditions exist, to see that the evil, for it is one, is corrected.

No company has the right to permit its agents to pervert the corporate funds from their legitimate purpose, by providing unnecessary or costly offices, or office furniture for their subordinates. Such an assumption is equally improper, as would be the lavish expenditure of their income in payment of salaries disproportionate to the labor performed, or distributing it among an army of attaches and dependants, who may be all the while consuming the substance of the corporation at the expense of those who have paid up their stock, or loaned money on their bonds.

There must be a reference to a master to examine the property levied on, and report, immediately, whether the same, on the principle indicated by the court, is necessary to the operation of the road; and if any part thereof can be disposed of, without injury to the company, to describe it.

Until the coming-in of the report, no further order will be made.

Demurrer overruled.